# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| **Cameron Johnson**; **Luke Thomas**; and **Trace Stevens**,<br><br>        Plaintiffs,<br><br>    v.<br><br>**A. Scott Fleming**, in his official capacity as the Director of the State Council of Higher Education for Virginia; **John Jumper**, in his official capacity as the Chair of the State Council of Higher Education for Virginia; **Major General James W. Ring**, in his official capacity as The Adjutant General of Virginia; and **Donald L. Unmussig**, in his official capacity as the Chief Financial Officer of the Virginia Department of Military Affairs,<br><br>        Defendants. | **Case No. 3:25-cv-00407-RCY**<br><br><br>**Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss** |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION ............................................................................................................... 1

SUMMARY OF FACTS ..................................................................................................... 3

      A.      The VTAG Program excludes programs deemed too religious.      3

      B.      The National Guard Grant Program excludes religious programs at the Department's choosing. ..........................................................................................4

      C.      The State Council denies VTAG to Cameron and Luke..........................................5

      D.      The Department denies a National Guard Grant to Trace. ...................................6

LEGAL STANDARD........................................................................................................... 7

ARGUMENT ....................................................................................................................... 8

I.      Plaintiffs have sufficiently stated a plausible Free Exercise Claim................................... 8

      A.      Defendants do not dispute that Plaintiffs have alleged a plausible claim under the Free Exercise Clause..........................................................................8

      B.      *Locke v. Davey* does not require dismissal of this case. ......................................10

            1.      Unlike *Locke*, Plaintiffs are not pursuing religious programs strictly to prepare to become clergy. ....................................................................... 10

            2.      Unlike *Locke*, Defendants permit comparable religious programs to participate and make discretionary, subjective decisions about which programs are eligible. ....................................................................... 12

            3.      *Locke*'s focus on the historical interest against using taxpayer funds to support the clergy is inapposite. ........................................................... 16

      C.      *Hall v. Fleming* is non-binding, distinguishable, and does not involve the National Guard Grant Program at all....................................................................18

II.      Plaintiffs have sufficiently stated a plausible claim under both Religion Clauses. .......... 20

      A.      Defendants' exclusions discriminate based on religious pervasiveness and cause government entanglement in religious matters. ...........................................20

      B.      Defendants' arguments are wrong. ......................................................................22

III.      Plaintiffs have sufficiently stated a plausible Equal Protection Claim............................ 24

IV.    Defendants cannot satisfy strict scrutiny. ........................................................ 25

CONCLUSION ................................................................................................................. 26

CERTIFICATE OF SERVICE ........................................................................................ 28

**TABLE OF AUTHORITIES**

Cases

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)............................................................................................ 1, 8, 9

*Barnett v. Inova Health Care Services,*
    125 F.4th 465 (4th Cir. 2025) ................................................................................. 7, 12

*Camreta v. Greene,*
    563 U.S. 692 (2011)................................................................................................... 18

*Canaan Christian Church v. Montgomery County,*
    29 F.4th 182 (4th Cir. 2022) .................................................................................... 14

*Carson v. Makin,*
    596 U.S. 767 (2022).............................................................................................. *passim*

*Catholic Charities Bureau, Inc. v. Wisconsin Labor & Industry Review Commission,*
    145 S. Ct. 1583 (2025)......................................................................................... *passim*

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993).............................................................................................. *passim*

*City of Cleburne, Texas v. Cleburne Living Center,*
    473 U.S. 432 (1985).................................................................................................. 24

*City of New Orleans v. Dukes,*
    427 U.S. 297 (1976).................................................................................................. 24

*Colorado Christian University v. Weaver,*
    534 F.3d 1245 (10th Cir. 2008) ........................................................................ 20, 21, 22

*Epperson v. State of Arkansas.,*
    393 U.S. 97 (1968)................................................................................................ 2, 21

*Espinoza v. Montana Department of Revenue,*
    591 U.S. 464 (2020)........................................................................................ 9, 10, 18, 23

*Everson v. Board of Education of Ewing Township,*
    330 U.S. 1 (1947).................................................................................................... 16

*Fulton v. City of Philadelphia, Pennsylvania,*
    593 U.S. 522 (2021)........................................................................................ 9, 13, 14, 25

*Hall v. Fleming*,
No. 3:25-cv-00186 (E.D. Va. May 9, 2025) ............................................................ 1, 3, 18

*Kennedy v. Bremerton School District*,
597 U.S. 507 (2022).................................................................................................. 8, 14, 22

*Larson v. Valente*,
456 U.S. 228 (1982)......................................................................................................... 20

*Locke v. Davey*,
540 U.S. 712 (2004)................................................................................................... *passim*

*Mahmoud v. Taylor*,
2025 WL 1773627 (U.S. June 27, 2025) ................................................................ 8, 15, 25

*Megaro v. McCollum*,
66 F.4th 151 (4th Cir. 2023) ............................................................................................. 7

*Mitchell v. Helms*,
530 U.S. 793 (2000)................................................................................................... 23, 24

*New York v. Cathedral Academy*,
434 U.S. 125 (1977)....................................................................................................... 22

*Phan v. Virginia*,
806 F.2d 516 (1986)................................................................................................... 22, 23

*Pueschel v. United States*,
369 F.3d 345 (4th Cir. 2004) .......................................................................................... 19

*Rosenberger v. Rector & Visitors of University of Virginia*,
515 U.S. 819 (1995)........................................................................................... 16, 17, 18, 21

*Tandon v. Newsom*,
593 U.S. 6 (2021).................................................................................................... 9, 12, 14

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
582 U.S. 449 (2017).............................................................................................. 9, 10, 11

*Trump v. CASA, Inc.*,
No. 24A884, 2025 WL 177363 (U.S. June 27, 2025) ...................................................... 18

*United States v. Skrmetti*,
145 S. Ct. 1816 (2025)..................................................................................................... 24

*Vlaming v. West Point School Board*,
302 Va. 504 (2023) ......................................................................................................... 17

iv

*Wallace v. Jaffree,*
    472 U.S. 38 (1985 ............................................................................................ 18

Statutes and Regulations

8 V.A.C. § 40-71-10 ................................................................................... 4, 5, 15

U.S. Const. amend. XIV ..................................................................................... 30

Va. Code § 23.1-610 ........................................................................................ 3, 5

Va. Code § 23.1-628 .......................................................................................... 17

Va. Code § 23.1-631 ................................................................................... 3, 4, 17

Va. Const. Art. I. § 16 ......................................................................................... 21

Other Authorities

James Madison, *Memorial and Remonstrance against Religious Assessments* (1785) .......... 16, 17

*Religious Leadership and Ministry (Minor)*, Mary Baldwin Univ ., https://bit.ly/4j22cmr
    (last visited July 19, 2025) ......................................................................... 4, 14

The Report of the Commission on Constitutional Revision, Gen. Assemb. of Va., Reg. Sess.
    1968, at 272 (1969) .................................................................................... 23

**INTRODUCTION**

Plaintiffs Cameron Johnson, Luke Thomas, and Trace Stevens are (or soon-to-be) students at Liberty University. The State Council of Higher Education for Virginia excludes Cameron and Luke from generally available Tuition Assistance Grants ("VTAG") solely because Cameron majors in Pastoral Leadership and Luke will major in Music and Worship. The Virginia Department of Military Affairs denied Trace a National Guard Grant solely because his major is in Religion. Defendants deem these majors as "religious training or theological education."

Defendants moved to dismiss, asserting that *Locke v. Davey*, 540 U.S. 712 (2004), forecloses all three of Plaintiffs' claims. Brief in Supp. of Mot. to Dismiss ("State's Brief"), Dkt. No. 20 at 2. They say that Plaintiffs' situation is "directly analogous to Davey's and compels this Court's dismissal." *Id*. at 14 (cleaned up). And they point to an unpublished case from this district that presents different facts and does not involve the National Guard Grant Program at all. *Id*. at 2 (citing *Hall v. Fleming*, No. 3:25-cv-00186 (E.D. Va. May 9, 2025), *on appeal,* No. 25-1574 (4th Cir.)). But Defendants do not dispute that Plaintiffs have stated viable free exercise claims under both the *Carson*-line and *Fulton*-line of cases. And *Locke*, and *Hall*, differ significantly from this case. At this stage Plaintiffs' need not prove their claims; they need only be "plausible." *Ashcroft v. Iqbal,* 556 U.S. 662, 678–79 (2009). Plaintiffs' claims are plausible under *Carson* and *Fulton*, and *Locke* does not apply for several reasons.

First, *Locke* is distinguishable because Virginia's grant programs are not neutral or generally applicable and require strict scrutiny. The scholarship program in *Locke* didn't have these problems because each college "determine[d] whether [a] student's major [was] devotional" and ineligible. 540 U.S. at 717. Here, Defendants decide. The State Council has "approved" some religious programs even though those programs prepare students for religious vocations. And the Department individually decides whether a certain religious program is eligible or not. That's what happened to Trace, whose program is eligible under VTAG but was

1

denied by the Department. In short, Defendants contradict themselves about which programs are permissible and which are not. This alone renders Virginia's grant programs not generally applicable and removes them from the reach of *Locke*.

Second, *Locke* doesn't apply because it hinged on Davey's specific intent to use the scholarship to prepare "for a lifetime of ministry, specifically as a church pastor." *Id.* (cleaned up). None of the Plaintiffs here are going to college strictly for the same, singular purpose. Cameron is considering careers as a pastor, in real estate, or in non-profit work. Luke is open to being a singer or songwriter, as well as a worship leader. And although Trace intends to become a chaplain, he may pursue a future career in law enforcement or full-time military.

Third, *Locke* turned on a historical interest in not funding the clergy. But that interest is inapposite because Plaintiffs are not clergy and may never be. In fact, the history relied on in *Locke* pointed to historical instances of the government compelling support of church leaders and certain denominations—for example, by levying taxes—*not* allowing the religious to participate in a generally available benefit program equally. *See id.* at 722.

Fourth, neither *Locke* nor *Hall* dealt with a denominational favoritism and religious entanglement claim of the type that Plaintiffs bring. The State Council favors CIP Code 38 religious programs over Code 39 religious programs based exclusively on the intensity of religious study. The Department favors secular religious studies over religious studies at religious schools. And both Defendants entangle themselves in religious matters by examining religious programs to draw these arbitrary lines. This violates the First Amendment's command that government must maintain "neutrality between religion and religion." *Cath. Charities Bureau, Inc. v. Wisconsin Lab. & Indus. Rev. Comm'n,* 145 S. Ct. 1583, 1594 (2025) (citing *Epperson v. State of Ark.*, 393 U.S. 97, 104 (1968)).

Fifth, *Locke* does not defeat Plaintiffs' equal protection claim for the same reasons that Defendants' grant programs fail general applicability and violate the First Amendment's prohibition against religious favoritism. Defendants treat Cameron, Luke, and Trace worse than their similarly situated peers based only on Defendants' subjective decisions about *religion*—a

2

fundamental right and suspect class. The Equal Protection Clause demands more and requires Defendants to justify this disparity under the rigors of strict scrutiny.

In sum, *Locke* is very different from this case. The only similarity is that Washington's program and Virginia's grant programs purport to bar education in "theology." *Locke*, 540 U.S. at 716; Va. Code §§ 23.1-610, -631. But the way Virginia goes about deciding what degrees fit in that category infringe several Constitutional protections—the grant programs are not neutral or generally applicable, result in religious favoritism, cause forbidden governmental entanglement, and treat similar students unequally. *Locke* had no occasion to address any of this.

Nor must the Court follow *Hall*. No. 3:25-cv-00186. That case is unpublished, not binding, and did not involve the National Guard Grant Program. Plus, the plaintiff there simply agreed with the State that *Locke* required dismissal of her case. For reasons explained below, *Locke* does not control. Plaintiffs are not waiving the white flag like the plaintiff in *Hall*.

In the end, Defendants' religious exclusions must survive strict scrutiny. They cannot do so based on the facts stated in the Complaint. As a result, Plaintiffs' claims remain plausible and the Court should deny Defendants' Motion to Dismiss.

## SUMMARY OF FACTS

### A.    The VTAG Program excludes programs deemed too religious.

The Virginia Tuition Assistance Grant Act provides non-need-based grants to Virginia-domiciled students who are enrolled full-time at a nonprofit private college ("VTAG"). The grant is generally available, but students in programs that the State Council deems to be for "religious training or theological education" are automatically excluded. Va. Code § 23.1-631(C). The State Council has determined that programs "classified as CIP Code 39-series programs" by the National Center for Education Statistics are programs for "religious training or theological education" and thus ineligible. 8 V.A.C. § 40-71-10 ("VTAG religious exclusion"). Although not stated in any regulation or policy, here for the first time, the State Council says its exclusion is

3

required by the Virginia Constitution's bar against funding "religious vocational education." *See* State's Brief at 3.

But the State Council does fund some religious vocational education. The State Council awards grants to students who choose government-approved religious degrees—those classified as CIP Code 38 programs. *See* Ver. Compl ("VC") Ex. 3, at 2–7, Dkt. No. 1-3 (Code 38 Degree Search Results). Many Code 38 religious programs prepare students for religious vocations or seminary school. *See* VC, ¶¶ 76–83, Dkt. No. 1. Thus, the difference between an approved Code 38 program and an excluded Code 39 program is the arbitrary determination of how religious government officials think it is. The State Council also issues grants to students in double-major programs that include an ineligible Code 39 major so long as the student takes an equal or greater number of approved courses per semester. 8 V.A.C. § 40-71-10. And if a student doesn't, the State Council can issue the grant if it decides there are "circumstances beyond the control of the student." *Id.* Finally, the State Council awards grants to students who minor in religious programs, including those designed to prepare students for "the practical, theoretical, and ethical grounding needed to begin a vocation in the ministry of any faith." VC ¶ 90 (quoting Religious Leadership and Ministry (Minor), Mary Baldwin Univ., https://bit.ly/4j22cmr (last visited July 19, 2025)).

### B. The National Guard Grant Program excludes religious programs at the Department's choosing.

The Virginia Department of Military Affairs administers a similar Tuition Assistance Grant Program for members of the Virginia National Guard. All service members qualify if they meet baseline criteria. Va. Code § 23.1-610(A). One such criteria is being "enrolled in and in good standing at any public *institution* of higher education or accredited nonprofit private *institution* of higher education whose primary purpose is to provide collegiate or graduate education and not to provide religious training or theological education." *Id.* (emphasis added). Although the grant statute says nothing about particular *programs*, the Department excludes students that it decides—in its discretion—are in programs that constitute "religious training or

4

theological education." VC ¶ 172 ("National Guard religious exclusion"). Like the State Council, the Department says the Virginia Constitution bans such funding. State's Brief at 6.

Because the Department has not adopted regulations explaining which degrees are for "religious training or theological education" it makes those determinations on a case-by-case basis. VC ¶ 173. That means some programs eligible for VTAG can be (and have been) deemed ineligible by the Department even though the State claims it cannot fund religious vocational education— what happened to Trace Stevens. VC ¶¶ 171, 223–29. The Department ambiguously says that "theological degrees"—without definition—"are ineligible." VC ¶¶ 174, 202; *see also* VC Ex. 5, at 3, § 7(a)(6)(c) (Command Policy 22-023), Dkt. No. 1-5. But the Department will pay for a religion degree at a secular private or public college. VC ¶ 179.

### C.    The State Council denies VTAG to Cameron and Luke.

Cameron Johnson will major in Pastoral Leadership at Liberty University starting this fall. VC ¶¶ 114–15. A lifelong Christian, Cameron's faith has shaped every aspect of his life. *Id.* at ¶¶ 97–107. While he always planned to attend college, it was during high school that he began to sense God leading him to eventually go into ministry. *Id.* at ¶¶ 108–09. He is still discerning whether that calling is to full-time vocational ministry or to ministering to others through a secular career. *Id.* at ¶ 110.

Cameron majored in Pastoral Leadership because he believes God called him to pursue it, it will develop his leadership skills, and it will prepare him for graduate school or future ministry. *Id.* at ¶ 116. Despite his major, Cameron is open to several future career paths, including working in real estate or for a non-profit organization. *Id.* at ¶¶ 117–18. He also plans to minor in Business to prepare him for a secular career. *Id.* at ¶ 119. Cameron will pursue whatever career that he believes God calls him to in his future. *Id*. at ¶ 113.

Cameron was denied a Tuition Assistance Grant for the 2025-26 year solely because the State Council believes his Pastoral Leadership major is too religious. *Id.* at ¶¶ 124–28.

Luke Thomas will also start his freshman year at Liberty this fall. *Id*. at ¶ 143. Luke didn't originally plan to go to college but thought he would enter a trade or start a small business. *Id*. at ¶ 139. After Luke learned that he could go to college and pursue a career in music—one of his passions—he decided to look for music programs that integrated his Christian faith. *Id*. at ¶¶ 140–44. Luke believes that God may one day use his musical talents in ministry though he is also considering several other careers. *Id*. at ¶¶ 141, 145. For example, he may pursue a career as a commercial singer or songwriter, and he plans to start a business one day. *Id*. at ¶ 146.

Luke plans to declare as a Music and Worship major no later than October 20, 2025. *Id*. at ¶ 153. Liberty's Music and Worship is classified as a CIP Code 39 program and once Luke declares, he will automatically be excluded from the Tuition Assistance Grant. *Id*. at ¶¶ 150–55. Like Cameron, Luke is a Christian and believes God called him to pursue his current college program. *Id*. at ¶¶ 141, 149.

The State Council considers both Cameron's and Luke's programs as for "religious training or theological education" even though neither are strictly focused on vocational ministry and most CIP Code 39 graduates at Liberty go into secular careers. *Id.* at ¶ 123.

### D.    The Department denies a National Guard Grant to Trace.

Trace Stevens is a member of the Virginia Army National Guard and a current Religion (General Track) major at Liberty University. Trace's Christian faith directs every aspect of his life. *Id.* at ¶¶ 181–85. Trace originally planned to enlist in the United States Air Force after high school, but during his senior year, he felt God was leading him to get a college degree to prepare him for a future career in some type of ministry work. *Id.* at ¶¶ 187–89. Although Trace's current plan is to become a chaplain in the military, he is open to several other secular careers as well. *Id.* at ¶¶ 208–09. For instance, he has considered a full-time military career as an officer, in law enforcement, or as a pilot. *Id.* at ¶¶ 210–11. Like Cameron and Luke, Trace is leaving the door open and will pursue whatever career God calls him to. *Id.* at ¶ 212.

Right before high school graduation, Trace spoke with a Virginia Army National Guard recruiter at his high school. The recruiter told Trace that if he enlisted, the National Guard would help pay for college and that his then-current plan to major in ministerial leadership at an out-of-state religious school would be eligible. *Id.* at ¶¶ 193–96. Trace believed the tuition assistance programs were a terrific benefit, so he enlisted in May 2023. *Id.* at ¶ 198.

But the recruiter was wrong. Trace later learned that the National Guard Grant Program would not pay for "religious studies." *Id.* at ¶ 199. Trace ultimately decided to major in Religion at Liberty, which is eligible for VTAG. *Id.* at ¶¶ 218, 223. Confused as to why his major was eligible for one state grant program but not another, Trace asked the Department to clarify if he was eligible for the National Guard Grant. *Id.* at ¶ 224; *see also* VC, Ex. 9, Dkt. No. 1-9 (Stevens 2025 Emails). The Department said he was not, denied him a grant for the spring 2025 semester, and explained that the National Guard Grant "has nothing to do with" the VTAG program. VC ¶¶ 223–29.

The federal government, however, has no qualms with funding Trace's Religion degree. Trace has participated in the U.S. Army's tuition assistance program since the fall 2024 semester without issue. *Id.* at ¶¶ 17, 257, 260. Trace will graduate this summer and plans to enroll in Liberty's Master of Divinity program but will continue to be denied a National Guard Grant solely because the Department deems that program as too religious. *Id.* at ¶¶ 268–69.

## LEGAL STANDARD

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Megaro v. McCollum*, 66 F.4th 151, 157 (4th Cir. 2023) (citation omitted). The Court "must accept the complaint's factual allegations as true and construe the facts in the light most favorable" to the Plaintiffs. *Barnett v. Inova Health Care Servs.*, 125 F.4th 465, 469 (4th Cir. 2025). Plaintiffs need not prove their claims at this stage; their Complaint must only "contain sufficient factual matter" to state a "plausible claim for relief." *Iqbal,* 556

U.S. at 678–79. And a claim is plausible where the alleged facts permit a "reasonable inference" that Defendants are "liable for the misconduct alleged." *Id.* at 678.

**ARGUMENT**

Defendants' Motion to Dismiss rests on *Locke v. Davey*. *See* State's Brief at 12 ("Each of the Plaintiffs' three Counts is foreclosed by ... *Davey*."). But *Locke* is factually and legally distinguishable. Defendants ignore that Virginia's higher education grant programs operate much differently than the scholarship program in *Locke* and that no Plaintiff is going to college to prepare exclusively for a religious vocation. *Locke*'s historical interest against funding the clergy is also inapposite because that history dealt with levying taxes for the compelled support of certain church leaders and denominations. Plus, the grant programs trigger strict scrutiny for other reasons not addressed by *Locke*: they are not neutral or generally applicable (Claim I), they discriminate among and cause government entanglement with religion (Claim II), and they treat similar students unequally (Claim III). Nor can Defendants survive strict scrutiny. Plaintiffs' claims therefore remain "plausible," *Iqbal*, 556 U.S. at 678, and the motion should be denied.

## I.    Plaintiffs have sufficiently stated a plausible Free Exercise Claim.

### A.    Defendants do not dispute that Plaintiffs have alleged a plausible claim under the Free Exercise Clause.

A "plaintiff may carry the burden of proving a free exercise violation in various ways." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022). One way is by showing that he is excluded from an otherwise available public benefit solely because of his religious "character," "activity," "anticipated use," or "exercise." *Carson v. Makin,* 596 U.S. 767, 778–81, 789 (2022) (citations omitted); *see also Mahmoud v. Taylor*, No. 24-297, 2025 WL 1773627, at *20 (U.S. June 27, 2025) (government "cannot condition" the "availability" of a public benefit on a one's "willingness to accept a burden on their religious exercise" (cleaned up)). Plaintiffs can also prove a free exercise violation "by showing" Defendants have "burdened [their] sincere religious practice pursuant to a policy that is not neutral or generally applicable." *Kennedy*, 597 U.S. at 525 (cleaned up). A law or policy is not generally applicable if it "treat[s] *any* comparable

8

secular activity more favorably than religious exercise," *Tandon v. Newsom*, 593 U.S. 61, 62 (2021), or if it includes "a mechanism for individualized exemptions," *Fulton v. City of Phila., Pa.* 593 U.S. 522, 533–34 (2021) (cleaned up).

At this stage, Plaintiffs need not "prove" a free exercise violation and must only allege sufficient facts that permit a "reasonable inference" that Defendants violated their free exercise rights. *Iqbal,* 556 U.S. at 678. The Complaint states that the Tuition Assistance Grant and National Guard Grant Programs violate the Free Exercise Clause under *Trinity Lutheran* and its progeny because they exclude Plaintiffs from a generally available public benefit due to their religious exercise. VC ¶¶ 231, 248, 250, 281, 295–308. Plaintiffs all believe God has called them to pursue their programs of instruction. Yet their religious exercise comes "at the cost of automatic and absolute exclusion from the benefits" that they are "otherwise fully qualified." *Trinity Lutheran Church of Columbia, Inc. v. Comer,* 582 U.S. 449, 462 (2017). Benefit programs that operate in this manner "must be subjected to 'the strictest scrutiny.'" *Carson,* 596 U.S. at 780 (quoting *Espinoza v. Mont. Dep't of Revenue,* 591 U.S. 464, 478 (2020)); *see also* Br. in Supp. of Mot. for Prelim. Inj. at 12–18, Dkt. No. 23.

The Complaint further states that the grant programs fail neutrality and general applicability and thus state a claim under *Fulton*, *Tandon*, and *Lukumi*. For instance, the VTAG religious exclusion is not generally applicable because the State Council awards grants to students in "CIP Code 38 religious programs, double-major programs, and religious minor programs [that] are designed to help students pursue a career in vocational ministry or further their religious training, like at seminary school." VC ¶ 92. Similarly, the Department "decides, in its complete discretion" which programs "are for religious training or theological education." *Id.* at ¶ 172. This religious gerrymandering and unbridled discretion likewise requires strict scrutiny. *Id.* at ¶¶ 309–28. The facts thus state "plausible" claims under the Free Exercise Clause.

Defendants do not dispute any of this. They do not assert that the grant programs are not public benefits or that Plaintiffs are not excluded solely due to their religious exercise. Nor do Defendants contest the fact that they fund other "approved" religious degrees and make case-by-

9

case decisions at their whim. They don't even try to argue that the programs are neutral or generally applicable.

Instead, Defendants resist these facts by insisting *Locke*—decided 13 years before *Trinity Lutheran*—instead controls and mandates dismissal. But *Locke* differs significantly from this case. And the distinctions matter because it takes this case out from under *Locke* and places it under the *Carson*-line of public benefits cases and the *Fulton*-line of lack-of- neutrality and -general applicability cases. And because Defendants do not argue that Plaintiffs have failed to state a viable claim under *those* latter precedents, their motion must be denied.

**B.       *Locke v. Davey* does not require dismissal of this case.**

At issue in *Locke* was Washington's Promise Scholarship program, which awarded scholarships to "high-achieving students" to help pay for postsecondary education expenses. 540 U.S. at 715–716. But students could not use the scholarship to pursue a "degree in theology." *Id.* at 716. Joshua Davey "had planned for many years to attend a Bible college and to prepare himself through that college training for a lifetime of ministry, specifically as church pastor." *Id*. at 717 (cleaned up). The Court emphasized that Davey's goal was to receive "training" "to lead a congregation," *id.* at 721, and under that premise, the denial did not violate the Free Exercise Clause given the historical interest against using "tax dollars" to "support[ ] the clergy." *Id.* at 723–24.

But the Supreme Court has three times cabined *Locke*'s "narrow reach" to its precise facts. *Carson*, 596 U.S. at 788; *Espinoza*, 591 U.S. at 479–83; *Trinity Lutheran*, 582 U.S. at 464–65. This case differs in three critical ways.

**1.       Unlike *Locke*, Plaintiffs are not pursuing religious programs strictly to prepare to become clergy.**

First, the Court's holding in *Locke* was based on Davey's representations that he would use his theology degree to become a pastor. Davey stated that he planned to use his chosen degree "for a lifetime of ministry, specifically as a church pastor." *Locke*, 540 U.S. at 717, 721. Given this expressed *intent* to be clergy, the Court invoked the historical interest against funding

10

the clergy. *Id.* at 722. *Locke* thus hinged on Davey's future intentions and not merely the label attached to his degree. As the Supreme Court explained in *Trinity Lutheran*, Davey "was denied a scholarship because of what he proposed *to do*—use the funds to prepare for the ministry." 582 U.S. at 464. And the Court in *Carson* explained that *Locke* itself "emphasized" that the scholarship "was intended to be used to prepare for the ministry." 596 U.S. at 788 (cleaned up).

But here, the Complaint does not allege that Cameron, Luke, or Trace have the same intentions of using their college education solely "to prepare for the ministry." *Id.* To be sure, all three may consider ministry work at some point, but the Complaint states that they are also considering various other secular careers. For example, unlike Davey who only went to college to prepare to be a pastor, Cameron planned to attend college *before* choosing a religious major. VC ¶¶ 108–110. The Complaint states that Cameron is also considering careers in real estate or nonprofit work and plans to add a business minor to aid him for a more traditional career. *Id.* at ¶¶ 118–19. Similarly, the Complaint states that Luke is interested in becoming a commercial singer or songwriter in addition to a worship director, and he plans to start his own business one day. *Id.* at ¶ 146. And Trace already serves a secular role as a servicemember in the Virginia Army National Guard. The Complaint also states that Trace is considering a career in law enforcement or as a pilot. *Id.* at ¶¶ 210–11. True, his current plan is to become a chaplain in the National Guard. *Id.* at ¶ 208. Yet the Department cannot claim an interest in not funding Trace's education to become a chaplain, when it undisputably pays its chaplains a salary.

Students across the country go to college without knowing what field they may end up in. Unlike Davey, Plaintiffs are going to college with several future careers in mind; some ministry-related, some not. And current plans often change. For example, Davey went on to become a lawyer, not a pastor, and most of Liberty's CIP Code 38 or 39 graduates "go into secular vocations, rather than ministry vocations." *Id.* at ¶ 123. As a result, the crux of *Locke*'s holding—Davey's intention to use the funds for devotional training to become clergy—is absent here. Cameron, Luke, and Trace shouldn't be punished based on the government's speculations

11

about their futures, especially when all three candidly admit they do not have the same intentions as Joshua Davey.

The facts stated in the Complaint differ significantly from *Locke*. Construing these facts in "the light most favorable" to Plaintiffs, they have met their baseline burden to state a plausible claim under the Free Exercise Clause. *Barnett,* 125 F.4th at 470.

> **2.    Unlike *Locke*, Defendants permit comparable religious programs to participate and make discretionary, subjective decisions about which programs are eligible.**

Second, Virginia's grant programs operate differently than the scholarship program in *Locke*. There, Washington categorically excluded devotional theology degrees and the "institution, rather than the State, determine[d] whether the student's major" was ineligible. *Locke,* 540 U.S. at 717. Conversely, here, Defendants decide whether a program constitutes "religious training or theological education," leading to inconsistent and arbitrary exclusions. VC ¶¶ 68–71, 166–78. The Complaint states that many students can receive funding for the very type of programs the State claims are barred. *Id.* at ¶¶ 75–92, 179. And unlike *Locke*, here government agencies contradict each other on that threshold question.

The differences matter because Virginia's programs are not neutral or generally applicable, thus causing constitutional infringements that were not present in—and thus not foreclosed by—*Locke*. There, Davey did not argue (nor did the record show) that Washington awarded some scholarships to comparable theology majors or that the state engaged in individualized assessments. *See generally Locke*, 540 U.S. 712. Indeed, the words "general applicability" do not even appear in the Court's decision. *Id.* But Virginia's grant programs *do* those things, are distinguishable from *Locke*, and thus independently trigger strict scrutiny.

***VTAG.*** The VTAG program favors comparable activity over Cameron's, Luke's, and Trace's religious exercise. Activities are comparable if they "pose" similar "risks" to the government's "interest that justifies the regulation at issue." *Tandon*, 593 U.S. at 62. Defendants' interest is *avoiding public funding for religious vocations*. *See* State's Brief at 3 ("prohibition

12

against public funding for religious vocations"), 15 ("decline funding for education in a religious vocation"). But the VTAG religious exclusion is fatally underinclusive because the State Council funds several other programs that also prepare students for religious vocations. The Complaint states at least four ways that it does so. VC ¶¶ 76–92.

First, Code 38 religious programs that prepare for religious vocations are eligible. For instance, Hampton University's Religious Studies program "sharpen[s] the skills of students already in ministry" and prepares them for "advanced studies, especially in religious education and theology." VC ¶ 79 (citation omitted). Other approved programs do the same: Virginia Union's Religious Studies major "prepare[s] persons ... to pursue religious vocations," *id.* at 80, Averett's program "aim[s] to graduate future leaders for churches," *id.* at ¶ 81, Virginia Wesleyan provides a streamlined path to seminary, *id.* at ¶ 82, and Bluefield's music program prepares students for "vocational music ministry," *id.* at ¶ 83 (all internal citations omitted).

Second, the State Council awards grants to students who double-major in an eligible program with a CIP Code 39 program. *Id.* at ¶ 84. These grants inevitably fund the Code 39 religious major. For example, a student double-majoring in Pastoral Leadership (ineligible) and History (eligible) can still receive a full grant as long as he takes an equal number of History courses per semester. *Id.* at ¶ 85. In fact, had Joshua Davey lived in Virginia, he likely could've received VTAG because he double majored "in pastoral ministries and business management/administration." *Locke*, 540 U.S. at 717. Its constitutional infirmities aside, Washington's exclusion was at least more narrowly tailored than the VTAG religious exclusion.

Third, State Council regulations contain a "formal mechanism for granting exceptions." *Fulton*, 593 U.S. at 537. The mechanism permits the State Council to issue VTAG funds to a Code 39 double-major student if "based on circumstances beyond the control of the student." VC ¶ 86 (quoting 8 V.A.C. § 40-71-10). The State Council has complete discretion to decide what "circumstances" suffice.

Fourth, the State Council awards grants to students who minor in religious programs that are preparatory for the ministry—such as Mary Baldwin University's Religious Leadership and

Ministry minor, which gives students "the practical, theoretical, and ethical grounding needed to begin a vocation in the ministry of any faith." VC ¶ 90 (quoting *Religious Leadership and Ministry (Minor)*, Mary Baldwin Univ., https://bit.ly/4j22cmr (last visited July 19, 2025)).

In short, the Complaint asserts that the State Council funds religious vocational programs, creating the same "risk" to its claimed interest. *Tandon*, 593 U.S. at 62. That contrasts from *Locke*, where there was no evidence that the government funded other degrees that prepared students for religious vocations. Because the VTAG religious exclusion is not applied "in an evenhanded, across-the-board way," it triggers strict scrutiny. *Kennedy*, 597 U.S. at 527.

**National Guard Program.** Next, the National Guard religious exclusion also fails to operate in an evenhanded manner, thus requiring strict scrutiny.

First, the program is a "discretionary system" where Department officials make "[i]ndividualized assessments" about whether a program is, in their view, too religious and thus ineligible. *Canaan Christian Church v. Montgomery Cnty.*, 29 F.4th 182, 198–199 (4th Cir. 2022) (citing *Fulton*, 593 U.S. at 538). "[N]othing in the National Guard Grant statute requires the Department to review an applicant's program." VC ¶ 167. Yet the Department disregards the statute's plain text and "simply exercises its discretion to decide whether a particular program is too religious." *Id.* at ¶ 170. This "invites" the Department to "decide" which programs are "worthy of solicitude"—those that secular-enough—precisely the harm the general applicability requirement guards against. *Fulton,* 593 U.S. at 537; *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 545–46 (1993).

Second, the Department's own Command Policy permits exceptions for "[s]pecial courses within a Virginia school's curriculum" to be funded on a "case-by-case basis," with no stated limits. VC Ex. 5, at 3, Dkt. No. 1-5. The Department has even acknowledged it would fund a required religious course "for another type of degree," confirming that religious coursework can qualify. VC Ex. 7, at 1, Dkt. No. 1-7. This "formal system of entirely discretionary exceptions" makes the religious exclusion not generally applicable. *Fulton,* 593 U.S. at 536.

14

Third, the Department makes its "determinations on a case-by-case basis." VC ¶ 173. And this case is a prime example of how the Department uses its arbitrary discretion. Both Defendants claim that grants can't be used for "religious training or theological education." State's Brief at 4–5 (citing Va. Code §§ 23.1-628(A), -631(C)). Yet Trace's Religion major is VTAG eligible but the Department denied him nonetheless. VC ¶ 223. Meanwhile, the Department funds religion majors at secular schools because it views them as nonreligious. VC ¶ 179. The Department's discretion never ends.

The scholarship program in *Locke* lacked the unconstitutional governmental judgment present here. There, each school decided if a program was for devotional theology or not. Here, the government decides, in "its complete discretion." VC ¶ 172. This subjective gatekeeping invites favoritism and entanglement, *see infra* § II, and destroys general applicability. *Locke* involved no such problems.[1]

***

Defendants largely ignore the grant programs' lack of general applicability and only claim they constitute "legal conclusions." State's Brief at 15. But they are concrete facts about how the Tuition Assistance and National Guard Grant Programs work—facts that show the programs are not neutral or generally applicable and must face "the most rigorous scrutiny." *Lukumi*, 508 U.S. at 546. At this stage, the Court must take as true that the State Council funds other programs that "are designed to help students pursue a career in vocational ministry," VC ¶ 92, and that "the Department simply exercises its discretion to decide whether a particular

---

[1] *Locke* also brushed aside Davey's neutrality claim, calling the burden "mild[ ]" since he didn't have to choose between his beliefs and a public benefit. 540 U.S. at 720–21. But the Supreme Court has clarified that the government cannot condition a benefit on a person's "willingness to accept a burden on their religious exercise." *Mahmoud,* 2025WL1773627 at *20; *see also Locke,* 540 U.S. at 731 (Scalia, J., dissenting) ("The First Amendment, after all, guarantees *free* exercise of religion, and when the State exacts a financial penalty of almost $3,000 for religious exercise—whether by tax or by forfeiture of an otherwise available benefit—religious practice is anything *but* free.").

program is too religious and therefore excluded from eligibility," *id.* at ¶ 170. Taking those facts as true, the grant programs are distinguishable from *Locke*.

### 3. *Locke*'s focus on the historical interest against using taxpayer funds to support the clergy is inapposite.

Third, *Locke* "expressly turned on what it identified as the 'historic and substantial state interest' against using 'taxpayer funds to support church leaders.'" *Carson,* 596 U.S. at 788 (quoting *Locke*, 540 U.S. at 722, 725). Although *Locke* did not formally apply any tier of scrutiny, the Court relied on the state's interest in avoiding "taxpayer funds to support church leaders," "state-supported clergy," "supporting clergy with public funds," and "*any* tax dollars from supporting the clergy." *Locke*, 540 U.S. at 722–24.

To support this interest, *Locke* cited the "backlash" to Virginia's "A Bill Establishing A Provision for Teachers of the Christian Religion," which was introduced in the early 1780s. *Id.* at 722 n.6. But that bill did not seek to create a generally available benefit program in which religious observers could participate. Instead, that bill "provided for the collection of a specific tax, the proceeds of which were to be appropriated 'by the Vestries, Elders, or Directors of each religious society ... to a provision for a Minister or Teacher of the Gospel of their denomination, or the providing places of divine worship, and to none other use whatsoever.'" *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 853 (1995) (Thomas, J., concurring) (quoting *Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1, 74 (1947) (supplemental appendix to dissent of Rutledge, J.)). In opposition to the bill, James Madison wrote his famous *Memorial and Remonstrance against Religious Assessments* (1785) (reprinted in *Everson,* 330 U.S. at 63–72 (supplemental appendix to dissent of Rutledge, J.)). Madison was concerned that "the same authority which can force a citizen to contribute three pence only of his property for the support of any one establishment, may force him to conform to any other establishment in all cases whatsoever[.]" *Id.* at ¶ 3. He also believed the bill "violate[d] that equality which ought to be the basis of every law," because it exempted "Quakers and Menonists" while "subjecting" others "to

16

peculiar burdens." *Id.* ¶ 4. Based on this history, the *Locke* Court found it permissible to not fund Davey given his pastoral intentions.

But this history is "misplaced" because it did not involve "the inclusion of religious ministers in [general] public benefits programs," but "laws that singled them out for financial aid." *Locke*, 540 U.S. at 727 (Scalia, J., dissenting). Indeed, "Madison's objection to the assessment bill did not rest on the premise that religious entities may never participate on equal terms in neutral government programs." *Rosenberger*, 515 U.S. at 854 (Thomas, J., concurring). Rather, "the Virginia assessment was flawed" because it "*singled out religious entities for special benefits*." *Id.* at 854–855(emphasis added). In other words, nothing in this history supports the contention "that the government must discriminate against religious adherents by excluding them from more generally available financial subsidies." *Id.* at 857.

That interest is especially misplaced here, where the Plaintiffs are not clergy, and may never be. Virginia's grant programs do not "endow[ ]" religion "above all others, with extraordinary privileges." Madison, ¶ 4, *supra*. They do the opposite by penalizing Plaintiffs' religious endeavors based only on speculation about their futures. The Supeme Court has repeatedly rebuked such "indirect ... penalties on the free exercise of religion" *Carson*, 596 U.S. at 778 (citation omitted).

Nor does *Locke*'s historical interest—not funding the *clergy*—support Defendants' exclusions of religious *instruction*. There is a robust history and tradition of funding religious instruction. For example, Thomas Jefferson—the author of Virginia's 1786 Act for Religious Freedom[2]—"advocated the use of public funds in Virginia for a department of theology in conjunction with other professional schools" and for "giving to the sectarian schools of divinity the full benefit of the public provisions made for instruction in the other branches of science." *Rosenberger*, 515 U.S. at 859 n.4 (Thomas, J., concurring) (cleaned up). Many early states

---

[2] The Act for Religious Freedom was later incorporated into Virginia's Religion Clauses. *See Vlaming v. W. Point Sch. Bd.*, 302 Va. 504, 529 (2023); *see also* Va. Const. Art. I. § 16.

17

funded religious schools and even "Congress paid churches to run schools for American Indians through the end of the 19th century." *Espinoza*, 591 U.S. at 481.[3]

In sum, any historical interest in not financing church leaders doesn't apply. Plaintiffs are 18- and 20-year-old college students interested in several future vocations. They are not currently pastors, priests, or clergy. Nor do they seek to benefit from a special tax to finance pastoral salaries. There is no historical tradition of forbidding college students from receiving generally available subsidies solely because their programs involve religion. Rather, there is a vast history of the government funding religious instruction and education. *Locke* does not "generally authorize the State to exclude religious persons from the enjoyment of public benefits on the basis of their anticipated *religious use* of the benefits." *Carson*, 596 U.S. at 789 (emphasis added). Virginia's grant programs do just that and must undergo strict scrutiny. *Id.* at 780.

C.    ***Hall v. Fleming* is non-binding, distinguishable, and does not involve the National Guard Grant Program at all.**

Defendants note that a different judge in this district recently applied *Locke* to dismiss a VTAG challenge in *Hall*, No. 3:25-cv-00186. To start, this Court need not follow *Hall*: "district court opinions lack precedential force even vis-à-vis other judges in the same judicial district." *Trump v. CASA, Inc.*, No. 24A884, 2025 WL 1773631, at *13 n.17 (U.S. June 27, 2025); *see also Camreta v. Greene,* 563 U.S. 692, 709 n.7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." (citation omitted)). *Hall* is unpublished and not binding.

---

[3] What's more, there is strong historical support of government directly financing ministers. In the First Congress, both Houses elected and paid a yearly salary to chaplains. *Rosenberger*, 515 U.S. at 858 (Thomas, J., concurring). In fact, "Madison himself was a member of the committee that recommended the chaplain system in the House." *Id.* And in 1803, President Jefferson signed a treaty with the Kaskaskia Indians, "which provided annual cash support for the Tribe's Roman Catholic priest and church." *Wallace v. Jaffree,* 472 U.S. 38, 103 (1985) (Rehnquist, J., dissenting ).

Nor should the Court follow *Hall* because it differs in at least four ways. First, it does not involve the Department's National Guard Grant's religious exclusion whatsoever. And as explained in this brief, the National Guard religious exclusion differs from VTAG and *Locke*.

Second, Bethany Hall is not considering careers beyond the ministry. Rather, she stated that "God is calling her to minister through music and worship to youth." Mem. Order (Granting Mot. to Dismiss) at 3, *Hall*, No. 3:25-cv-00186, (E.D. Va. May 9, 2025), Dkt. No. 15 (citation omitted). Contrast that with Luke, who is pursuing the same "Music and Worship" major but open to several careers, like becoming a commercial singer or songwriter. VC ¶¶ 145–46.

Third, Hall brought one claim under a single legal theory: that her grant denial violated the Free Exercise Clause under *Trinity Lutheran*, *Espinoza*, and *Carson*. Verified Compl. at 10–11, *Hall*, No. 3:25-cv-00186, (E.D. Va. May 9, 2025), Dkt. No. 1. Here, Plaintiffs bring three claims under the Free Exercise, Religion, and Equal Protection Clauses. And Plaintiffs allege several violations under the Free Exercise Clause: religious discrimination, exclusion from public benefits, religious gerrymandering and targeting, and lack of neutrality and general applicability. VC ¶¶ 294–328. These arguments were neither raised nor addressed in *Hall*.

Fourth, Hall chose to concede that "*Locke* forecloses her claim," so the Court was "bound to dismiss the case." Resp. to Mot. to Dismiss at 1–2, *Hall*, No. 3:25-cv-00186, (E.D. Va. May 9, 2025), Dkt. No. 12 (cleaned up). Judge Novak did not have the benefit of complete briefing, and Hall's position allowed for an easy dismissal. *See Pueschel v. United States,* 369 F.3d 345, 354 (4th Cir. 2004) (failure to oppose motion to dismiss "entitle[s], as authorized" court to dismiss "suit on the uncontroverted bases asserted therein"); *see also* Mem. Order (Granting Mot. to Dismiss) at 5, *Hall*, No. 3:25-cv-00186, (E.D. Va. May 9, 2025) Dkt. No. 15 ("Plaintiff effectively concedes that her situation aligns with the one faced by the undergraduate student . . . in *Locke* . . . ."). Plaintiffs make no such concession here. As explained, the VTAG and National Guard Grant Programs violate the Constitution in ways the program in *Locke* did not.

19

**II.     Plaintiffs have sufficiently stated a plausible claim under both Religion Clauses.**

   **A.     Defendants' exclusions discriminate based on religious pervasiveness and cause government entanglement in religious matters.**

Cameron, Luke, and Trace have also sufficiently pled a plausible claim under both Religion Clauses of the First Amendment. "'The clearest command of the Establishment Clause' is that the government may not 'officially prefe[r]' one religious denomination over another." *Cath. Charities*, 145 S.Ct. at 1591 (quoting *Larson v. Valente*, 456 U.S. 228, 244 (1982)). This prohibition is "inextricably connected with the continuing vitality of the Free Exercise Clause." *Cath. Charities*, 145 S.Ct. at 1591 (citation omitted). The Religion Clauses thus demand neutrality among, and bar subtle forms of discrimination against, the religious.

For example, just last month the Supreme Court held that Wisconsin engaged in "denominational discrimination" by differentiating "between religions along theological lines." *Id.* There, Catholic Charities Bureau and its sub entities sought a "religious-employer exemption" from Wisconsin's unemployment tax regime. *Id.* at 1589. The Wisconsin Supreme Court upheld the denial of that exemption by ruling that Catholic Charities was "not operated primarily for religious purposes" because they did not "engage[ ] in proselytization or limit[ ] their services to fellow Catholics" and so did not qualify for the exemption. *Id.* at 1591–92. But Catholic Charities' religion forbade it from using charity as a means for proselytizing or from serving only Catholics, while other religious groups that did those things qualified for the exemption. *Id.* Wisconsin had thus preferred "certain religions based on the commands of their religious doctrine," triggering strict scrutiny *Id.* at 1592–93.

The Tenth Circuit's decision in *Colorado Christian University v. Weaver* is also instructive. 534 F.3d 1245 (10th Cir. 2008). There the court held that Colorado discriminated "on the basis of religious views or religious status" by "extending scholarships to students at some religious institutions, but not those deemed too thoroughly 'sectarian' by government officials." *Id.* at 1258 (cleaned up). The "discrimination [was] expressly based on the degree" of a college's "religiosity," *id.* at 1259, which transgressed the First Amendment's guarantee of "equal

20

treatment of all religious faiths," *id.* at 1257. The court also held that Colorado's exclusion caused unconstitutional "excessive entanglement between religion and government" because officials reviewed the religiosity of a college's curriculum and policies to determine whether it was "pervasively sectarian." *Id.* at 1261–63 (cleaned up).

Defendants' religious exclusions similarly discriminate based on the "religiosity" of a given program. Neither the State Council nor the Department purport to draw lines based on some objective, secular criteria. To the contrary, the exclusions turn expressly on whether Defendants decide whether a degree is "for religious training or theological education" or not. VC ¶¶ 68, 172. Students who study religion intensively are excluded; those who study multiple religions or a single religion less-deeply are not. A "law that discriminates ... on the basis of the pervasiveness or intensity of [one's] belief" is not neutral among religion. *Colo. Christian*, 534 F.3d at 1259; *see also Rosenberger*, 515 U.S. at 844 (rejecting dissent's view that government could "scrutinize the content of student speech" to decide whether it "contain[ed] too great a religious content").

And the Supreme Court has cautioned that "scrutinizing whether and how a religious school pursues its educational mission" would "raise serious concerns about state entanglement with religion and denominational favoritism." *Carson*, 596 U.S. at 787. If the government is prohibited from doing so at the institutional level, it is prohibited from doing so at the individual program level. Defendants' exclusion of certain religious programs based on the depth of study is just like Wisconsin favoring religious groups that proselytize or serve only coreligionists, and like Colorado favoring students at "sectarian" colleges over students at "pervasively sectarian" colleges. Simply put, Defendants have judged the religiosity of Plaintiffs' programs, deemed them too religious, and excluded them. That's far from maintaining "neutrality between religion and religion." *Cath. Charities*, 145 S.Ct. at 1594 (quoting *Epperson*, 393 U.S. at 104).

Both Religion Clauses also prohibit Defendants' from "trolling through," or "monitoring or second-guessing" Plaintiffs' programs. *Colo. Christian*, 534 F.3d at 1261 (citation omitted). Defendants "discern the boundary" between permissible religious instruction and impermissible

21

religious instruction—an inquiry that "is highly subjective and susceptible to abuse." *Id.* at 1262. Defendants have no business answering these inherently religious questions for "[t]he First Amendment does not permit government officials to sit as judges of the 'indoctrination' quotient of theology classes." *Id.* at 1263; *see also New York v. Cathedral Acad.*, 434 U.S. 125, 133 (1977) ("The prospect of church and state litigating in court about what does or does not have religious meaning touches the very core of the constitutional guarantee against religious establishment.").

### B.    Defendants' arguments are wrong.

Defendants give three reasons this claim should be dismissed. All three fail.

First, Defendants claim that the Supreme Court rejected an Establishment Clause claim in *Locke*. But "*Locke* involved neither discrimination among religions nor intrusive determinations regarding contested religious questions" as Plaintiffs allege here. *Colo. Christian*, 534 F.3d at 1256. *Locke* did not involve "state officials[']" perceptions of "how 'sectarian'" a program was, nor did Washington "engage in intrusive religious inquiry" because each college determined whether a major was devotional. *Id.* But both problems are present here. And the Court attributed one footnote to the Establishment Clause argument, only stating that "for reasons noted *supra*," the State did not "disapprov[e] of a particular religion or of religion in general." *Locke*, 540 U.S. at 725 n.10 (quoting *Lukumi*, 508 U.S. at 532). This single line does not render Plaintiffs' claim implausible, especially considering the Supreme Court's recent decision in *Catholic Charities*.

Second, *Phan v. Virginia* is inapplicable. 806 F.2d 516 (1986). There, a handicapped student was denied financial aid because he attended an out-of-state church-affiliated school. *Id.* at 518. Under the now-defunct *Lemon* test, the court ruled that the ban did not "impermissibly disfavor[ ] church-affiliated colleges" because the State permitted aid to in-state sectarian schools, thus showing no "hostility to religion." *Phan*, 806 F.2d at 519; *see Kennedy,* 597 U.S. at 534 (noting the "Court long ago abandoned *Lemon*"). Importantly, Phan *did not* argue that the State favored "in-state sectarian schools over out-of-state sectarian schools." *Phan*, 806 F.2d at

22

519 n.5. The court noted it was "conceivable" that the State "effectively channels aid to some sects to the exclusion of others" but "such a claim ha[d] not been presented in th[e] case." *Id*. In short, Phan's Establishment Clause claim—based on overruled law—differs from Plaintiffs' denominational favoritism and entanglement claim.

Third, Defendants say Plaintiffs' claim must fail because the grant programs increase funding at religious nonprofit institutions. But this argument side-steps Defendants' favoritism and arbitrary decision-making. Plaintiffs are not *solely* arguing that Virginia has acted out of hostility to religion as in *Locke*.[4] The constitutional violations go beyond that. And an "infringement of First Amendment rights" "cannot be justified by a State's alternative view that the infringement advances religious liberty." *Espinoza*, 591 U.S. at 485. Allowing some students at religious schools to receive public grants may be progress, but the State still favors some religious students to the detriment of others. Plaintiffs have stated a viable claim under the Religion Clauses of the First Amendment.

---

[4] Still, as explained in Plaintiffs' Brief in Support of Motion for Preliminary Injunction at 22–24, (Dkt. 23), Article VIII, § 10 and Article VIII, § 11 of the Virginia Constitution are provisions "born of bigotry" and "hostility" to religion. *Mitchell v. Helms*, 530 U.S. 793, 828–29 (2000) (plurality opinion). The provisions are based on an outdated notion that the Establishment Clause forbids all funding to the religious. In fact, when the Constitution was revised in 1971, the Committee on Constitutional Revision considered permitting sectarian schools to receive funding on equal terms with nonsectarian schools under Article VIII, § 10, but rejected that idea to maintain the "separation of church and state" and to avoid a similar Blaine Amendment fight that had just occurred in New York state. *See* The Rep. of the Comm. on Const. Revision, Gen. Assemb. of Va., Reg. Sess. 1968, at 272 (1969) (the report is available at http://bit.ly/4lzz2wQ). And Article VIII, § 11—the main provision that Defendants rely on—was added in 1971 to allow loans (and later grants) to private colleges in Virginia out of fear that absent state-aid, those colleges would close, thus burdening the State. *Id*. at 273. That provision *had* to allow aid to "church-related" colleges because most private colleges in the State *were* church-related. *See id*. at 274 (noting 9 out of 12 members of the Association of Independent Colleges were church-affiliated). Yet § 11 kept a prohibition on loans at schools with a "primary purpose of religious training or theological education" to not "weaken[ ] the wall of separation between church and state." *Id*.

23

### III.    Plaintiffs have sufficiently stated a plausible Equal Protection Claim.

Cameron, Luke, and Trace's equal protection claim likewise survives the State's Motion. The Equal Protection Clause prohibits the government from denying "to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Clause demands that "all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). So laws that treat people differently based on a fundamental right, or based on a "suspect" classification must be "suitably tailored to serve a compelling state interest." *United States v. Skrmetti*, 145 S. Ct. 1816, 1828 (2025) (cleaned up).

The VTAG religious exclusion and National Guard religious exclusion treat Cameron, Luke, and Trace worse than their similarly situated classmates based solely on their religiously-motivated decisions. Their decisions to major in Pastoral Leadership, Music and Worship, and Religion are religious exercise—a fundamental right—and Defendants' "distinctions" based on those religious choices are inherently "suspect." *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (per curiam). Only those students "who think that their religion should affect the whole of their lives"—including by dictating their educational choices—suffer the State's exclusions. *Mitchell,* 530 U.S. at 827–28.

Defendants cite *Locke*'s footnote 3 as their lone defense. State's Brief at 18; *see Locke*, 540 U.S. at 720 n.3. But that footnote's two sentences did not hold that any time equal protection and free exercise claims arise out of the same set of facts, the former hinges on the latter. And as explained in sections I.A.1 and II, *supra,* Defendants cannot rely on *Locke* here because they do not pursue their interest against funding religious vocational education evenhandedly. Take Trace, for example. He was denied a National Guard grant because the Department said his Religion major was for "religious training or theological education." VC ¶ 229. But an identical student in Trace's shoes—a CIP Code 38 Religion major at Liberty University—could apply for and receive VTAG funding. Or consider a student similarly situated to Cameron, except that the student elects to major in "Biblical Studies" at Liberty—a CIP Code 38 major—instead of Pastoral Leadership. That similarly situated student would be approved for VTAG. Finally, a

24

student at a secular private school or public school is permitted to major in a religious program and still receive a National Guard Grant. VC ¶ 179. The State's subjective choices hinge *only on religion* and so it must justify the disparate treatment by explaining it has a compelling reason to exclude Cameron, Luke, and Trace but not others.

### IV.      Defendants cannot satisfy strict scrutiny.

Whether analyzed under *Carson*, *Espinoza*, and *Trinity Lutheran* or under *Fulton* and *Tandon*, Plaintiffs' free exercise claim requires the application of strict scrutiny. Their Religion Clauses and equal protection claims also demand strict scrutiny because of Defendants' excessive entanglement, religious favoritism, and disparate treatment of students. Defendants make no attempt to clear that high bar at this stage. In any event, they cannot do so.

"To survive strict scrutiny, a government must demonstrate that its policy advances interests of the highest order and is narrowly tailored to achieve those interests." *Mahmoud*, 2025WL1773627 at *22 (cleaned up); *Cath. Charities*, 145 S. Ct. at 1591–92. Defendant's purported interest is *avoiding public funding for religious vocations*. *See* State's Brief at 3.

Yet the religious exclusion "cannot be regarded as protecting an interest of the highest order" because "it leaves appreciable damage to that supposedly vital interest unprohibited." *Lukumi*, 508 U.S. at 547 (cleaned up). The Complaint states that the State Council funds other "eligible" religious programs that prepare students for religious vocations. *See* VC ¶¶ 78–92 (citing examples of such funding). And the Department's "system of exceptions"—which allows it to fund programs in its complete discretion—"undermines" its claim that it cannot issue a grant to Trace. *Fulton*, 593 U.S. at 542.

Instead, Defendants must show that they have a "compelling interest" in not funding Cameron, Luke, and Trace specifically. *Id.* at 541. But how could they when none of the three are clergy, and may never be? Nor can such a compelling interest exist when the Department pays its chaplains and the federal government willingly subsidizes Trace's Religion program. The Supreme Court is clear: an "interest in separating church and state more fiercely than the

Federal Constitution cannot qualify as compelling in the face of the infringement of free exercise." *Carson*, 596 U.S. at 781 (cleaned up).

Defendants' religious exclusions are also not narrowly tailored because they are "overbroad or underinclusive in substantial respects." *Lukumi*, 508 U.S. at 546. Underinclusive because many other students can receive awards for religious degrees, including those that "train[ ] for religious professions." State's Brief at 14. And overbroad because many students— like Cameron, Luke, and Trace—can't receive an award even though they are not specifically preparing (nor may ever join) the clergy. *See Cath. Charities*, 145 S. Ct. at 1594 ("overinclusiveness ... cannot be described as narrow tailoring").

## CONCLUSION

For these reasons, Plaintiffs have stated plausible claims for relief under the First and Fourteenth Amendments. The Court should deny Defendants' Motion to Dismiss for Failure to State a Claim.

Respectfully submitted,

s/ *Jacob E. Reed*
Jacob E. Reed
VA Bar No. 97181
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, VA 20176
Telephone: (571) 707-4655
jreed@ADFLegal.org

Ryan J. Tucker*
AZ Bar No. 034382
Jeremiah J. Galus*
AZ Bar No. 030469
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
Telephone: (480) 444-0020
rtucker@ADFLegal.org
jgalus@ADFLegal.org

David A. Cortman*
GA Bar. No. 188810
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road, NE
Suite D-1100
Lawrenceville, GA 30043
Telephone: (770) 339-0774
dcortman@ADFLegal.org

Attorneys for Plaintiff
* *Admitted pro hac vice*

27

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was filed on July 21, 2025 using the Court's CM/ECF system.

*s/ Jacob E. Reed*

Jacob E. Reed
Counsel for Plaintiffs